# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Battle Construction Co., Inc., individually and on behalf of all others similarly situated,<br>　　　　Plaintiff,<br><br>　　　　v.<br><br>InVivo Therapeutics Holdings Corp. and Frank Reynolds,<br>　　　　Defendants. | Case No. 14-cv-13180<br><br><br>Plaintiff Requests Trial By Jury |

## COMPLAINT

Plaintiff ("Plaintiff"), by and through its attorneys, individually and on behalf of all others similarly situated, files this complaint against defendants ("Defendants"), and alleges as follows.

## PRELIMINARY STATEMENT

This is a federal securities class action on behalf of a class (defined further below) consisting of all persons and entities who purchased the common stock of InVivo Therapeutics Holdings Corp ("InVivo" or the "Company") from April 5, 2013 through August 26, 2013,

inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of federal securities laws.

## PARTIES

1.     Plaintiff Battle Construction Co., Inc. purchased shares of InVivo common stock during the Class Period, as set forth in its certification attached hereto, and was damaged thereby.

2.     Defendant InVivo is a Nevada corporation with its principal place of business in Cambridge, Massachusetts.

3.     Defendant Frank Reynolds ("Reynolds") was Chief Executive Officer, Chairman and Chief Financial Officer of InVivo at relevant times until he resigned from those positions on or about August 22, 2013.

## JURISDICTION AND VENUE

4.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act (15 U.S.C. §78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

5.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

6.     Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as InVivo has its principal place of business in this District and a substantial part of the conduct complained of herein occurred in this District.

7.     In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of a national securities exchange.

## CLASS ACTION ALLEGATIONS

8.      Plaintiff brings this action on its own behalf and on behalf of a class pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) consisting of all persons or entities who purchased the common stock of InVivo during the Class Period and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the current and former officers and directors of InVivo, members of their immediate families, their legal representatives, heirs, successors or assigns, and any entity in which any excluded person or entity has or had a controlling interest.

9.      This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23.

10.      The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, on information and belief there are at least hundreds, and likely thousands, of members in the class.  InVivo currently has approximately 93 million shares of common stock outstanding and had approximately 66 million shares outstanding on March 31, 2013.  The average daily trading volume in the Company's stock during the last three months was approximately 312,000 shares.

11.      Members of the Class may be identified from records maintained by InVivo or its transfer agent or by records of brokers and other institutional custodians, and they may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

12.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual member of the Class.  The common questions include, *inter alia*, the following:

      a)     whether Defendants violated the federal securities laws as alleged herein;

      b)     whether statements made by Defendants to the investing public during the Class Period were false or misleading by reason of omitted material facts;

      c)     whether the statements and omissions alleged herein were made with scienter; and

      d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

13.     Plaintiff's claims are typical of the claims of the other members of the Class, and Plaintiff does not have any interests adverse to the Class.

14.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

15.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class.

16.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

17.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## FACTUAL ALLEGATIONS

18.     InVivo describes itself as a biotechnology company in the business of developing treatments to improve function in individuals paralyzed from traumatic spinal cord injuries.  It is developing a biopolymer scaffold product for individuals with acute spinal cord injuries.

19.     InVivo issued a press release on April 4, 2013 announcing that the Company had received approval from the FDA for Humanitarian Use Device designation for its biopolymer scaffold product for treatment of spinal cord injuries.

20.     InVivo's stock price increased sharply in reaction to the announcement, closing on April 4 at $2.75, a 16% increase over the April 3 closing price of $2.36.  Trading volume in InVivo's shares skyrocketed to 683,500 shares, up from average daily trading volume of approximately 71,000 shares during the previous three trading days.

21.     On April 5, 2013 prior to the market opening, InVivo issued a press release announcing that the FDA had approved the Company's Investigational Device Exemption to begin human studies of its biopolymer scaffold product involving five patients.  In particular, the press release stated the following with respect to the timing of the trial.

> With this approval, InVivo intends to commence a first-in-man clinical study in the next few months . . . .  The Company expects the study to occur over approximately 15 months.

5

22.     Defendant Reynolds stated in the press release that "we expect to have all data to the FDA by the end of 2014."

23.     At least one analyst commented on the significance of the April 5 press release and its implications for the Company's finances and stock price.

24.     The analyst published an article on April 9, 2013 on the widely followed financial website Seeking Alpha, which stated that the enrollment and treatment of five patients was expected to take approximately two to three months, that patient follow up will last twelve months, and that "InVivo believes that all data will be in hand roughly 15 months after initiation."

25.     The same analyst published another article on Seeking Alpha on April 29, 2013, in which he modeled InVivo's potential sales and revenues from the biopolymer scaffold product as part of his analysis of the potential value of InVivo stock, concluding that his model yielded a fair value target of $5 per share for InVivo stock.  His model assumed the launch of the product in 2015.

26.     InVivo's stock price rose in response to the April 5 press release, closing on April 5 at $2.80 a share on elevated trading volume of 504,900 shares.

27.     On the next trading day, Monday April 8, 2013, trading volume in InVivo stock increased sharply to 1,333,800 shares, with a jump in the stock price to $3.19, an increase of 14% over the April 5 close and an increase of 35% over the closing price of $2.36 on April 3.

28.     InVivo's stock price continued to increase on the following days on unusually high trading volume.

29.     InVivo issued a press release on May 9, 2013 reporting first quarter financial results and providing a "business update". With respect to the FDA approval reported on April 5, Defendant Reynolds was quoted in the press release as follows:

> We are off to a great start for 2013 and continue to accelerate our plans. We've received FDA approval to commence a first-in-man clinical study for our biopolymer scaffolding product. . . . Wall Street has noticed and our stock price has appreciated significantly since these key milestones were achieved.
> This has permitted us to call investor warrants that will provide up to $16.1 million of equity capital, but more importantly will remove an accounting liability that has been an impediment to up-listing to a national securities exchange.

30.     In a section of the May 9 press release captioned "Recent Corporate Highlights", InVivo reiterated its previous representation that "[t]he Company expects to commence the study in mid-2013 and submit data to the FDA by the end of 2014."

31.     InVivo issued a press release on June 4, 2013 announcing that the call period for the investor warrants referred to in the May 9 press release expired on June 3, and that the Company raised $16.1 million from exercise of the warrants. The press release further stated that the exercise of the warrants combined with a warrant exchange offer completed on May 17, 2013 resulted in the elimination of a $24.6 million warrant liability on InVivo's balance sheet.

32.     Defendant Reynolds stated in the June 4 press release:

> With the resultant elimination of the $24.6 million warrant liability from our books, the last major obstacle to up-listing to a national securities exchange has been removed. We expect that an up-listing to a national securities exchange will increase liquidity and unlock inherent value in our stock.

33.     Defendants' representations as to the timing and importance of the study were false and misleading. Defendants failed to disclose in the April 5 and May 9 press releases that the FDA's approval of the clinical study included conditions that made it impossible to complete the study in 15 months or to submit data to the FDA by the end of 2014, as represented.

34.     Defendants belatedly disclosed the FDA conditions and their impact on timing, in a press release issued on August 27, 2013 before the market opened.

35.     The August 27 press release included the following disclosures:

> Under the conditions of the FDA's approval of the Investigational Device Exemption, the five-person pilot trial will be staggered such that each patient will be followed for three months prior to requesting approval to enroll the next patient.  Because the Company must obtain FDA approval to enroll each subsequent patient, the Company anticipates that from the date of the first enrolled patient, it will take at least 21 months to complete enrollment.

36.     Completing the study in 15 months, and submitting data to the FDA by the end of 2014 (*i.e.*, in less than 20 months from April 5), as previously represented by Defendants, was obviously impossible in light of the FDA's condition that each patient had to be followed for three months and then FDA approval was required to enroll the next patient.

37.     Following five patients for three months each totals 15 months by itself.  In addition, FDA approval of each of the last four patients would necessarily consume time, not to mention the time involved in enrolling each new patient and then applying the scaffold product to the patient before beginning the three month period of following the patient.

38.     The Company acknowledged in the August 27 press release that it "anticipates that from the date of the first enrolled patient, it will take at least 21 months to complete enrollment."  Once enrollment was completed, it would take a minimum of 3 months for following the last patient, or a total of 2 years from the date the first patient was enrolled in the study.

39.     The Company's representations of the time within which the study would be completed and data submitted to the FDA were also false and misleading because they failed to

8

disclose that significant time was necessary for the medical sites proposed to conduct the study to obtain institutional approval and finalize contracts with InVivo.

40.     As a result of the August 27 disclosure, the price of InVivo shares declined sharply to close at $2.07 or an approximately 40% decline in the stock price from the August 26 closing price of $3.45, on extremely heavy trading volume of 4,486,500. The stock price declined further on August 28, closing at $1.71, another 17% decline, again on unusually heavy volume of 3,658,000 shares.

41.     According to a press release issued by InVivo on December 26, 2013, InVivo, more than eight months after the April 5 announcement, was then planning

> to send its revised protocol and other supporting materials to six sites next week so that those sites can start their Institutional Review Board reviews and finalize contracts with InVivo.

42.     InVivo further disclosed in the December 26 press release that the Company expected that "these Institutional Review Board reviews and contract finalizations will take approximately 4-12 weeks, and that the first site will be ready to accrue subjects in the first half of March."

43.     In other words, the Company expected to begin the process of selecting subjects to enroll in the study approximately 11 months after the April 5 press release.

44.     The Company issued a press release on March 17, 2014 which included a "business update". The press release stated that "[o]ne clinical site has now received Institutional Review Board approval and finalized its contract and a second site is nearing completion of these steps."

45.    The March 17 press release further stated that the company "expects that its first clinical study site will receive product and be ready to enroll subjects in the second quarter of 2014."

46.    Defendants' statements in the April 5 and May 9 press releases quoted in paragraphs 21, 22, 29 and 30 above were false and misleading, and omitted to disclose material facts necessary to make the statements made not misleading, in light of the conditions to the FDA's approval of the clinical trial which made it impossible for the Company to complete the trial and submit data to the FDA in the time periods represented in those statements.

47.    The time periods stated for completion of the trial and submission of data from the trial to the FDA were also false and misleading in light of the time necessary for clinical sites to obtain Institutional Review Board approval and to enroll patients, steps that InVivo knew or recklessly disregarded when it made the statements set forth in paragraphs 21, 22, 29 and 30 above.

48.    Defendants had ample motives to misrepresent the time needed to complete the clinical trial and submit data to the FDA, in order to present the Company's condition and financial prospects in a rosier light.

49.    First, InVivo clearly was in need of additional cash to finance its operations, including the large expenses inherent in conducting a clinical trial.

50.    According to the Company's press release dated May 9, 2013 reporting financial results for the quarter ended March 31, 2013, the Company was a developmental stage company with no operating revenue, its only income consisted of $2,580 of interest income (which was far outweighed by $28,555 of interest expense), it suffered an operating loss of $2,581,466 for the quarter, and it had a net loss for the quarter of $13,326,257.  The May 9, 2013 press release also

reported that the Company had only $10,300,993 in unrestricted cash at March 31, 2013, approximately $2,500,000 less than the cash it had at December 31, 2012.[1] The May 9, 2013 press release also disclosed that "our stock price has appreciated significantly since these key milestones [FDA approval of the clinical study and Humanitarian Use Device designation, reported in the April 4 and April 5 press releases cited above] were achieved", and that the stock price increase "has permitted us to call investor warrants that will provide up to $16.1 million of equity capital."

51.     In short, the April 5 press release had the desired effect, as the reported news resulted in a sharp increase in the stock price, permitting the Company to call warrants and raise millions of dollars in cash.

52.     The Company's poor cash position led it to suspend temporarily its hydrogel product development programs in November 2013.

53.     InVivo announced in a press release dated November 15, 2013 that it had temporarily suspended its hydrogel product development programs due to the Company's focus on the scaffold product.  However, commentators quickly recognized that the suspension was for the purpose of conserving cash.

54.     In an article published on a *Boston Globe* website, Globe correspondent Scott Kirsner, reported that "the company said it would put development of another product on hold", and commented "[b]ut InVivo may be running out of time", as an analyst had "estimated the company has just $19 million in cash, giving it about a year left to live, barring further fund-raising."

---

[1] The Company reported that it also had $601,381 in restricted cash as of March 31, 2013 and March 31, 2012.

55.     The estimate of "about a year left to live" was well founded.  The Company had an adjusted net loss (excluding non-cash items) of $19,120,000 for 2013.

56.     The Company's constrained financial condition was further reflected in additional expense reductions in 2014.

57.     InVivo announced in a press release dated June 23, 2014 that it had a reduction in force of 28% of its workforce and it had eliminated certain research and development activities, in order to achieve annual expense savings of approximately $3 million and to reduce cash expenditures by approximately 23%.

58.     Second, Defendant Reynolds was motivated to generate an increase in InVivo's stock price because he was regularly selling stock during the Class Period.  Beginning prior to the commencement of the Class Period and continuing into the Class Period, he sold 4,250 shares of InVivo common stock every trading day, except that on May 1, 2013 he disposed of 78,450 shares and on May 21, 2013 he sold 8,500 shares.  On June 13, 2013, Reynolds increased his sales to 12,000 shares virtually each trading day through the end of the Class Period and beyond.

59.     A series of resignations of key InVivo executives raises suspicions about what was actually happening within the Company.

60.     Defendant Reynolds resigned from his positions as Chairman, CEO and CFO of InVivo on or about August 22, 2013.  According to a press release issued by InVivo on August 22, Reynolds resigned "due to his medical condition".

61.     But according to an article by a correspondent for *The Boston Globe* dated November 17, 2013, Reynolds launched a new start-up the same month he resigned from InVivo. The article stated:

> Whatever medical condition that caused [Reynolds] to resign from InVivo
> in August does not seem to have slowed him down.  That same month, he
> launched a new start-up focused on Parkinson's disease, PixarBio, based
> in New Hampshire.

62.     The August 22, 2013 InVivo press release disclosing Reynolds' resignation also reported that Sean Moran had been appointed acting CFO, effective immediately.

63.     Moran resigned as CFO effective immediately less than a month later, as reported in a Company press release dated September 9, 2013.

64.     Gregory D. Perry was appointed interim Chief Financial Officer as Moran's replacement on September 16, 2013.  However, less than three months later, Perry notified the Company that he would be "pursuing another opportunity."

## COUNT I

### For Violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5
### (Against All Defendants)

65.     Plaintiff repeats and realleges each allegation set forth herein.

66.     This count is brought pursuant to Section 10(b) of the Securities Exchange Act (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

67.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which throughout the Class Period deceived the investing public, including Plaintiff and other Class members, as alleged herein and caused Plaintiff and other members of the Class to purchase InVivo common stock at artificially inflated prices.

68.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a course of conduct to misrepresent and conceal adverse material information about the FDA's approval of the clinical trial as alleged herein.

69.     Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that, as alleged above, they:   (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon the purchasers of InVivo common stock during the Class Period.

70.     Defendants had actual knowledge of the false statements and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Defendants' material omissions were done knowingly or recklessly and for the purpose and effect of concealing the true facts concerning InVivo from the investing public and artificially inflating the price of its common stock.

71.     As a result of the false and misleading statements and the failure to disclose material facts, as set forth above, the market price for InVivo's common stock was artificially inflated during the Class Period.   In ignorance of the fact that market prices of InVivo's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the statements made by Defendants that were false and misleading and omitted material facts, or upon the integrity of the market in which the Company's common stock traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired InVivo common stock during the Class Period at artificially high prices and were damaged thereby.

72.     During the Class Period, InVivo securities were traded on an active and efficient market.   Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of InVivo securities at prices artificially inflated by Defendants' wrongful conduct.   At the time of said false and misleading statements and omissions of material facts, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.   Had Plaintiff and the other members of the Class and the marketplace known the truth, Plaintiff and other members of the Class would not have purchased or otherwise acquired InVivo common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices at which they did.

73.     By virtue of the foregoing, Defendants have knowingly or recklessly, directly or indirectly, violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

74.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

75.     This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchases of securities giving rise to the cause of action.

## COUNT II

**For Violations of Section 20(a) of the Exchange Act
(Against All Defendants)**

76.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

77.     This count is brought pursuant to Section 20(a) of the Exchange Act.

78.     Defendant Reynolds acted as a controlling person of InVivo within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of Defendant Reynolds' positions as Chairman of the Board, CEO and CFO of InVivo, and his participation in and/or awareness of the facts and circumstances concerning the FDA's approval of a clinical trial, he had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of InVivo, including the content and dissemination of the various statements, including the press releases discussed herein, that Plaintiff contends are false and misleading and omitted to state material facts as alleged herein.

79.     InVivo's primary business activity consisted of the development of the biopolymer scaffold product.  Accordingly, Defendant Reynolds would have been knowledgeable concerning  the specifics and conditions of the FDA's approval of a clinical trial for the biopolymer scaffold product.

80.     Defendant Reynolds was provided with or had unlimited access to copies of InVivo's press releases, public filings and other statements alleged by Plaintiff to be false and misleading and which omitted material facts, prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.  Reynolds himself was quoted in the April 4, 2013, April 5, 2013, May 9, 2013 and June 4, 2013 press releases discussed above.

81.     Defendant Reynolds had direct and supervisory involvement in the day-to-day operations of InVivo and, therefore, is presumed to have had the power to control or influence the statements giving rise to the securities violations as alleged herein, and to have exercised such control or influence.

82.     As set forth above, InVivo violated Section 10(b) and Rule 10b-5.  By virtue of his position as a controlling person, Defendant Reynolds is liable pursuant to Section 20(a) of the Exchange Act as he culpably participated in the fraud alleged herein.  As a direct and proximate result of Defendant Reynolds wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of InVivo's common stock during the Class Period.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the other members of the Class, requests that the Court enter judgment against Defendants as follows:

A.     Declaring that this is a properly maintainable class action under Federal Rule of Civil Procedure 23(a) and (b)(3) and declaring Plaintiff to be a proper representative of the Class;

B.     Awarding Plaintiff and members of the Class damages together with interest thereon;

C.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

D.     Granting such other and further relief as this Court may deem just and proper.

Dated:  July 31, 2014                              By its attorneys,

                                                    /s/ Thomas G. Shapiro
                                                   Thomas G. Shapiro *BBO#454680*
                                                   **SHAPIRO HABER & URMY LLP**
                                                   Seaport East
                                                   Two Seaport Lane
                                                   Boston, MA 02210
                                                   Telephone: (617) 439-3939
                                                   tshapiro@shulaw.com

                                                   *Counsel for Plaintiff*

## PLAINTIFF'S CERTIFICATION OF
## SECURITIES FRAUD CLASS ACTION COMPLAINT

Battle Construction Co., Inc. ("the Company"), by its duly authorized officer, hereby certifies that the following is true and correct to the best of its knowledge, information, and belief:

1. I have reviewed the Complaint.

2. The Company is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

3. The Company's transactions in InVivo securities during the Class Period were as follows:

| Date | Transaction | # of Shares | Price Per Share |
|------|-------------|-------------|-----------------|
| 6/13/2013 | Buy | 2000 | $3.85 |

4. The Company did not purchase these securities at the direction of the counsel, or in order to participate in any private action arising under the Securities Act of 1933 or the Securities Exchange Act of 1934.

5. The Company has neither served, nor sought to serve, as a representative party on behalf of a class in a securities fraud lawsuit during the three-year period preceding the date of signing this certification.

6. The Company will not accept any payment for serving as a representative on behalf of the Class beyond its pro rata share of any possible recovery, except for an award, as ordered or approved by the Court, for reasonable costs and expenses (including lost earnings) directly relating to the representation of the Class.

Signed under the penalties of perjury this 25th day of July, 2014.

By: _____